**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 20-356 |
| | ) | |
| KENDRE CAIN, | ) | |
| | ) | |
| Defendant | ) | |

**OPINION**

Robert J. Colville, United States District Judge.

Pending before the Court is Defendant Kendre Cain's Motion to Suppress (ECF No. 31). Mr. Cain moved to suppress all cell phone evidence, all evidence derived from his traffic stop, arrest and search, the seizure and search of the vehicle he was driving at the time of his arrest, as well as the seizure of the cell phones located within the vehicle.

For the reasons that follow, the Court will deny the motion.

**I. BACKGROUND**

On November 17, 2020, a federal grand jury returned a multi-count Indictment against Defendant Kendre Cain.  (ECF No. 1).  Mr. Cain  is charged at Count 1 of the Indictment with possession with intent to distribute a quantity of fentanyl, in violation of 21 U.S.C. § 841(a)(1) and § 841 (b)(1), at Count 2 of the Indictment with possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), at Count 3 of the Indictment with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(2), and at Count 4 of the Indictment with possession of a firearms with an obliterated serial number, in violation of 18 U.S.C. § 922(k).

Mr. Cain moved to suppress the evidence against him arising from an incident on May 20,

2020 when he was pulled over by police and searched. Mr. Cain also submitted two exhibits in support of his Motion: a transcript of a preliminary hearing held in the Court of Common Pleas of Allegheny County dated August 26, 2020 and the application and authorization of a search warrant dated June 25, 2020.  (ECF Nos. 32-1, 32-2.)

The Government opposed the motion to suppress in an omnibus response to all pretrial motions (ECF No. 35) and included exhibits thereto.  These exhibits included: 1) the City of Pittsburgh Bureau of Police Investigative Report dated May 20, 2020, which, inter alia, describes the evidence obtained as a Smith and Wesson .40 caliber pistol with obliterated serial number, a magazine and ammunition, 18  bundles of heroin, $1,951 in currency, a baggie of marijuana, an iPhone, and an Alcatel Phone (ECF No. 35-1); 2) Pennsylvania Department of Transportation ("PennDOT") Bureau of Driver Licensing Certified Driver History of Mr. Cain, dated March 3, 2021[1] (ECF No. 35-2); 3) PennDOT Driver License Information of Mr. Cain dated March 3, 2021 which indicates as "Suspension Information" that his driver's license is "revoked, suspended, cancelled or recalled" (ECF No. 35-3);  4) Allegheny County Office of Medical Examiner Report of Laboratory Findings dated August 10, 2020 indicating that seventy six white stamp bags stamped "PINK PANTHER" tested positive as fentanyl and forty white stamp bags stamped "A" tested positive as fentanyl (ECF No. 35-4); 5) Commonwealth of Pennsylvania, County of Allegheny Application for Search Warrant (signed by Pittsburgh Bureau of Police Officer Joshua Anderson) and Authorization dated June 25, 2020, in which the application to search the iPhone and Alcatel Phone was authorized on June 26, 2021 (ECF No. 35-5).

---

[1] This exhibit was filed as part of the record on March 4, 2021.

The Court held an evidentiary hearing on the Motion to Suppress. (ECF No. 39).[2] Detective Joshua Anderson testified for the Government, and the Government also introduced multiple documents into evidence: the map of Skyline Terrace neighborhood of Pittsburgh, defendant's certified driver history, PennDOT's driver's information, and the search warrant for cellphones. Defendant submitted four photographic exhibits, specifically photographs of the unmarked police vehicle (blue Chevrolet Impala), two photographs of Defendant's arrest on May 20, 2020, and the photograph of marijuana recovered at the time of Mr. Cain's arrest.

At the end of the evidentiary hearing, the evidentiary record for the suppression motions was deemed complete.

Following the hearing, counsel for Mr. Cain filed a post-hearing brief in support of his motion (ECF No. 43), and counsel for the Government filed a post-hearing Proposed Findings of Fact and Conclusions of Law. (ECF No. 42). Neither party elected to file a response in opposition. The matter is now ripe for disposition.

## II. FACTUAL FINDINGS

"On a motion to suppress evidence, the trial judge sits as the finder of fact." *United States v. France*, 414 F. Supp. 3d 747, 750 (W.D. Pa. 2019) (citing *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)). Accordingly, a district court judge assesses the credibility of witnesses, weighs the evidence, and draws any appropriate conclusions and inferences from the evidence. *Id.*

As noted *supra*, the Government called a single witness to testify at the suppression hearing: Pittsburgh Police Detective Joshua Anderson, who was involved in the arrest of Mr. Cain

---

[2] At the hearing the Court orally denied without prejudice Defendant's Motion for Discovery (ECF No. 26), Motion to Produce Evidence (ECF No. 27), Motion for Early Disclosure (ECF No. 28), Motion for Early Production of *Jencks* Material (ECF No. 29) and Motion for Leave to File Supplemental Pretrial Motions.  (ECF No. 30).

on May 20, 2020.  He testified about the arrest and the events leading up to the arrest. His testimony, coupled with the documentary evidence, provides the factual record that the Court considers when deciding the Defendant's Motion.

Based on the Court's estimation and experience, coupled with the Court's personal observation of Detective Anderson's testimony and demeanor as a witness, and in light of the Court's consideration of his testimony in the context of all of the admissible evidence before the Court, the Court finds and concludes, broadly, that he testified credibly.  Defense counsel's questioning of the detective revealed some weaknesses in his testimony that causes the Court to question the weight given to certain portions of his testimony, more specifically identified herein below.

Detective Anderson, who at the time of the incident in question had been working for the City of Pittsburgh Police for approximately five years, was patrolling the Hill District section of Pittsburgh on the day in question.  He described his job as prevention of violent crime and criminal drug activity.  (Suppression Hearing Transcript, ECF No. 43-1, hereinafter "Tr.," at 8). Detective Anderson had been involved in well over twenty-five drug arrests and over twenty-five gun arrests as of the date in question. (Tr. at 9).  In summary, he testified he received a video on May 20, 2020, from a fellow officer showing Mr. Cain in possession of a firearm while driving a car. (Tr. at 12-13).[3] A few hours later, at approximately 3:00 p.m., while patrolling in plainclothes in an unmarked vehicle with Agent Smith of the Pennsylvania Attorney General's office, Detective Anderson saw Mr. Cain, the only occupant of the vehicle, driving a rented Nissan Rogue.  Believing Mr. Cain to be driving without a valid license Detective Anderson stopped him. (Tr. at 13, 18).

Detective Anderson's knowledge of Mr. Cain prior to the stop, important to our analysis,

---

[3] The Court's reluctance to attribute much, if any, weight to this evidence is more fully addressed herein below.

is as follows.  He credibly testified that during an interaction approximately two months before the traffic stop,[4] Detective Anderson believed that Mr. Cain's driver's license was suspended past May 20, 2020. (Tr. at 14, 35).  Detective Anderson knew Defendant based on "at least ten" prior interactions. (Tr. at 12).  He could not recall the date of any prior encounters with Defendant and did not know the reason for the license suspension, other than it was not related to a DUI conviction.  Detective Anderson had seen Mr. Cain within a few weeks of the incident.  He had previously pulled him over when Mr. Cain was the driver.  (Tr. 34, ECF No 32-1 at 14).  However, prior to the day of the stop, Anderson had never arrested Mr. Cain or cited him for a driving and/or vehicle code violation. (Tr. at 34, 42).  There was no check of Mr. Cain's license status on the day of the stop.

A later check of the Defendant's driver history confirmed Detective Anderson's suspicion that the Defendant's license was suspended on the day of the stop, May 20, 2020. (Tr. at 17, Gov't Exhibits. 2[5] and 3[6]).  Specifically, the Defendant's driver history indicated that he received a six-month suspension effective June 13, 2019 for a reckless driving offense that occurred on November 22, 2018. (Tr. at 15-16, Gov't Exhibits 2 and 3).  The Defendant received a second six-month license suspension effective December 13, 2019 based on an incident that occurred on June 21, 2019 (Tr. at 16, Gov't Exhibits 2 and 3).  The suspension of the Defendant's driver's license was also extended multiple times based on his failure to respond. (Tr. at 16, Gov't Exhibits 2 and 3).  Thus, Mr. Cain's license has been continuously suspended since June 13, 2019.

---

[4] Detective Anderson's testimony on this specific point, i.e. how long ago he encountered Mr. Cain and determined that he was, at that time subject to a suspended license, is anything but perfectly consistent or certain, either as offered in earlier testimony or in the suppression hearing itself. Approximately two months, however, seems to be the settled position taken by Detective Anderson.

[5] Ex. 2 is Mr. Cain's Pennsylvania Department of Transportation ("PennDOT") Certified Driver History.

[6] Ex. 3 is Mr. Cain's Justice Network PennDOT Driver License Information.

Detective Anderson initiated the traffic stop because he believed the license to still be suspended based on the prior check. (Tr. at 36).

Detective Anderson testified:

Q.   Now, you said you were familiar with Kendre Cain at the time you saw him driving the vehicle?

A.   That's correct.

Q.   How were you familiar with him?

A.   Just he's been on traffic stops we've had.  Just interacting with him in the neighborhood we patrol in.

Q.   Approximately how many times had you interacted with him prior to that date?

A.   I'd say at least ten times.

Q.   Just to be clear, that does not mean that you arrested him or acquired ten arrests?

A.   That's correct.

Q.   Were you familiar with Mr. Cain having any type of reputation at that point?

A.   I know he's been arrested for firearms and shootings.

(Tr. at 12).  Mr. Cain's criminal history includes convictions[7] on November 2, 2017 for prohibited possession of a firearm, tampering with and/or fabrication of physical evidence, and false identification to law enforcement officer.  *Commonwealth v. Cain*, CP-02-CR-0015245-2016, https://ujsportal.pacourts.us/CaseSearch.

Detective Anderson testified that earlier that day he had received[8] a video with text message

---

[7] Charges withdrawn therein include aggravated assault, firearms not to be carried without a license, recklessly endangering another person, carrying a loaded weapon.

[8] Q.   And did you receive any information regarding Mr. Cain earlier that day?
A.   Yes.
Q.   What was that information?
A.   I received a text message of him holding a firearm inside a vehicle.
Q.   Who did you receive that text message from?
A.   Detective Berberich.
Q.   Is that another Pittsburgh Police detective?
A.   Yes.
Q.   What exactly did that video depict?

on his personal cell phone depicting Mr. Cain holding a gun while sitting in a car. We would

characterize this testimony as less than reliable, if only because of the lack of candor demonstrated

by Detective Anderson's failure to previously disclose this potentially significant information in

prior testimony, and the very late disclosure of the same to the attorneys involved in this matter

---

A.  It showed him holding a firearm, and it was in his lap.
Q.  How soon prior to you observed [sic] Mr. Cain did you receive that video?
A.  This traffic stop happened around 3:00 p.m., and it was within a couple hours.
Q.  I guess moving forward some, you did eventually obtain a video of Mr. Cain holding a firearm – or with a firearm in that vehicle on his phone; is that correct?
A.  That is correct.
Q.  And when was that video taken?
A.  I think around noon, if I'm correct.
Q.  On the day of the incident?
A.  Yes.
Q.  Now, to be clear, whenever you received the text message, did you know that Mr. Cain had taken that video that day?
A.  We did not.
Q.  Did you know that Mr. Cain had taken that video even in that vehicle?
A.  No.
(Tr. 12-13).   Detective Anderson did not preserve this video or text , he did not document its existence in any official report or nor did he testify to it at either the state-court preliminary hearing or before the federal grand jury, and he did not disclose it to the Assistant United States Attorney until the Friday before the suppression hearing, on April 16, 2021. (Tr. at 6 – 11, 13, 38 – 47).  He explained on re-direct:

Q.  Why did you not put in your report or put in the search warrant that you had been sent that video via text message?
A.  We were unaware – I was unaware of when that actual video happened.  I don't know when it was taken or what car it was actually taken in.
Q.  So when you were asked previously if he had done anything illegal on that day, were you responding in a way that you were unsure?
A.  That's correct.
Q.  Now, just generally, is it common that you and other officers will text videos or things pulled from social media to each other?
A.  Yes.
Q.  And why is that that you send that information back and forth?
A.  To give knowledge to other officers of what's going on in their area.
Q.  And is there a reason that you would not want to put the fact that you were aware of this video in your reports or in the criminal complaint or in the search warrant?
A.  Yes.
Q.  Why is that?
A.  It's just because then the defendants, they find out we monitor their social media.  And then they stop putting their criminal activities on it.
Q.  And is that the reason why in this case specifically you did not put in that information?
A.  Yes.

(Tr. 48-49).

immediately prior to this suppression hearing.

After following Mr. Cain for approximately 15 seconds, Detective Anderson initiated a traffic stop and turned on lights and sirens.  (Tr. at 18).  Mr. Cain was the sole occupant of the vehicle.  There is no dispute Mr. Cain did not pull over immediately.  Instead, he drove slowly and turned right onto Addison Street. He stuck his head out of the window and pointed in the direction of the rear parking lot of 155 Addison Street.  (Tr. 30).  Mr. Cain turned right into the parking lot and parked.  (ECF 35-5 at 2, Affidavit of Probable Cause).  He did not attempt to flee.  (Tr. 32).

A second unmarked vehicle was there on the day of the incident; it was occupied by Detective Seretti and Agent Jena.  (ECF No. 35-5 at 2). After Mr. Cain parked the rental car, the officers stopped their cars in such a way as to block Mr. Cain's car.  They got out, drew their firearms, and ordered Mr. Cain to exit his car at gunpoint. (Tr. at 19).  There is some evidence the officers may have maintained concern for their safety because Mr. Cain did not pull over immediately and the officers could not see what Mr. Cain was doing below the level of the car window.  To that end, we note that at the preliminary hearing, the following exchange took place between defense counsel and Detective Anderson:

Q: And at [the time Mr. Cain exited the vehicle] it's fair to say that you didn't see him make any furtive movements at that time, correct?

A.  Well, based on the fact that from my report where it said he stuck his head out the window and wasn't initially pulling over, that's why.  So we didn't know what he was doing in the car.

* * *

Q. And at the time that you were getting him out of the car and you were eye to eye with him so to speak, you didn't see him make any furtive movements, is that correct?

A. Well, I couldn't below (inaudible) where the window was.

(ECF No. 32-1 at 19-20).

The officers smelled marijuana after the vehicles had stopped and as Mr. Cain was being

ordered from the car.  According to the Affidavit of Probable Cause, "As we made contact with Cain we opened his door and detained him.  As we got Cain out of the vehicle a strong odor of marijuana overwhelmed us."  (ECF No. 35-5). Yet Detective Anderson testified credibly that he and his fellow officers smelled the odor of marijuana as they walked towards the car. (Tr. at 19). Specifically, he testified that as they were ordering Mr. Cain out of the vehicle, "We could smell a *strong* odor of marijuana coming from it."  (Tr. at 19 (emphasis added)); *see also* Tr. at 38).  He also explained, "As we were close to the car and talking with him until he got out, yeah, we could smell it coming from the car. . . We gave him commands to get out of the car."  (ECF No. 32-1 at 22). When shown Defense Exhibit D, the photo of the marijuana that was later recovered in plain view in the rear passenger seat, Detective Anderson further described the size of the marijuana as "a little bigger than a quarter."  (Tr. at 33, *see also* ECF No. 32-1 at 11 (marijuana laying on top of back seat of vehicle in plain view and immediately identifiable to Detective Anderson as marijuana)).  Detective Anderson described the odor smelled by the officers as "fresh."  (ECF No. 32-1 at 23).

Mr. Cain was pulled from the vehicle by Agent Smith, was placed face down on the ground, put in handcuffs, stood up, and then patted down.[9]  Tr. at 50-51. As Detective Anderson patted down Mr. Cain to check for weapons, he felt packaged narcotics in Mr. Cain's hoodie pocket. (Tr. at 20). Detective Anderson seized 18 bundles of fentanyl and $1,951. (Tr. at 20-21).  After he was searched and contraband found, Tr. at 29, officers seized a firearm,[10] two phones, and marijuana from the car. (Tr. at 21, 32).[11] Detective Anderson subsequently obtained a search warrant for the

---

[9] This was clarified on re-direct and re-cross.  (Tr. 50-51).

[10] At the preliminary hearing Detective Anderson testified that the gun was loaded. (ECF No. 32-1 at 8).

[11] According to the Affidavit of Probable Cause, the silver and Black Smith and Wesson with obliterated serial number, magazine and bullets were found in the center consol by Detective Seretti, the Ziploc bag containing the 18

phones, with certain electronic data seized as a result. (Tr. at 21-22, Gov't Exhibit 5).

## III. DISCUSSION

Mr. Cain moved to suppress all evidence derived from his stop, arrest and search, the seizure and search of the vehicle he was driving at the time of his arrest, as well as the seizure of the cell phones and electronic cell phone information which was obtained pursuant to a search warrant.  (ECF No. 32)

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. Subject to certain exceptions, evidence obtained through unreasonable searches and seizures must be suppressed as "fruit of the poisonous tree." *United States v. Bey*, 911 F.3d 139, 144 (3d Cir. 2018); *see also Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). Although a traffic stop is a "seizure" within the meaning of the Fourth Amendment, it has historically been reviewed under the reasonable suspicion framework first articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Delfin–Colina*, 464 F.3d 392, 396 (3d Cir. 2006).

### Reasonable Suspicion

The Court must decide whether the vehicle stop of Mr. Cain was supported by reasonable suspicion.  A basic premise of the search and seizure doctrine is that searches undertaken without judicial oversight and a warrant issued upon probable cause are "per se unreasonable," subject only to a few specifically established exceptions. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).  The Supreme Court established one such exception in *Terry v. Ohio*,

---

bundles of heroin was found in Mr. Cain's hoodie pocket by Agent Smith, the knotted plastic baggie containing marijuana was found on the rear seat of the car by Agent Smith, the $1,951 was found in Mr. Cain's left pants pocket by Agent Smith, and the two phones were recovered by Agent Jena from the driver's seat. (ECF No. 35-5).

392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), holding that a police officer may conduct a brief, investigatory stop when the officer, accounting for his professional experience, has a reasonable, articulable suspicion that criminal activity may be afoot. The reasonable suspicion standard delineated in *Terry* applies equally to routine traffic stops. *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006). The government has the initial burden to prove that a *Terry* stop is based on reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Reasonable suspicion is an "elusive concept," but it unequivocally demands that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Courts "afford significant deference to a law enforcement officer's determination of reasonable suspicion." *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018).

Reasonable suspicion, particularly in the context of traffic stops, is not a high bar. As the Supreme Court put it: "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion ... require[d] is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 572 U.S. at 397, 134 S.Ct. 1683 (internal quotation marks and citations omitted). Any "articulable facts that an individual was violating a traffic law at the time of the stop," therefore, will satisfy the constitutional requirement. *Delfin-Colina*, 464 F.3d at 398. The Supreme Court has held that an officer's "actual motivations" for making the traffic stop "play no role" in the court's constitutional analysis. *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Delfin-Colina*, 464 F.3d at 398 ("[A] court should only look to whether specific, articulable facts produced by the officer would support reasonable suspicion of a traffic infraction."). In forming a

reasonable suspicion, officers may rely on their own experience and knowledge. *Terry*, 392 U.S. at 27, 88 S.Ct. 1868; *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir.2006).

We find based upon Detective Anderson's testimony and other relevant record evidence that the primary[12] basis of Detective Anderson's belief that Mr. Cain was not properly licensed was his prior NCIC check that occurred an estimated two months prior to the stop, and that this formed a reasonable suspicion of a traffic infraction. There is no dispute that driving with a suspended license would be a violation of Pennsylvania law.[13] There is no dispute that Detective Anderson's suspicions of Mr. Cain's driving status at the time of the stop ultimately proved to be accurate.

Defendant argues that Detective Anderson's knowledge of Mr. Cain's prior suspended license status should be considered stale. We are guided by the following cases.[14] In *United States v. Pierre*, 484 F.3d 75, 83–84 (1st Cir. 2007), the court held that an officer had reasonable suspicion to stop Defendant's car, and that the district court did not err in failing to suppress the cocaine seized incident to his arrest. The court reasoned:

> When evaluating a claim of staleness, courts do not measure the timeliness

---

[12] At this juncture the court gives little weight to the testimony that Detective Anderson received a video via text message of Mr. Cain with a firearm. Regardless, Detective Anderson knew from his experience on patrol in the neighborhood who Mr. Cain was and had had numerous prior interactions that Mr. Cain in which Mr. Cain had been involved in other traffic stops. He also knew Mr. Cain had been alleged to have been involved in shootings and firearms violations.

[13] Specifically, 75 Pa. C.S.A. § 1543 provides: any person who drives a motor vehicle on any highway or trafficway of this Commonwealth after the commencement of a suspension, revocation or cancellation of the operating privilege and before the operating privilege has been restored is guilty of a summary offense and shall, upon conviction or adjudication of delinquency, be sentenced to pay a fine of $200.

[14] Of course each of these cases is fact-specific and the outcome is driven by the particular circumstances therein. Defendant sites to *Commonwealth of Pennsylvania v. Farnan*, 55 A.3d 113 (Pa. Super. 2012) for the proposition that a bright-line approach to information received beyond 30 days is warranted, as expressed in the now-Justice Wecht's concurring opinion. There, the court held that wherein the officer's knowledge is general and limited, any delay beyond 30 days (the minimum length of a DUI suspension in Pennsylvania) is too speculative to comport with Fourth Amendment concerns. Defendant concedes, this concurrence is not binding on this Court. (ECF No. 43 at 11).

of information simply by counting the number of days that have elapsed. *United States v. Bucuvalas,* 970 F.2d 937, 940 (1st Cir.1992), *abrogated on other grounds by Cleveland v. United States,* 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000). Rather, a court must assess the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information. *Cf. id.*

At the suppression hearing, Officer Murphy testified that from September 1999 to September 2000 he had worked in the vice and intelligence unit of the Fall River Police Department. During that time, Pierre's name came up often in conversation; fellow officers frequently discussed his drug dealing, and Officer Murphy was informed that Pierre did not have an active license. Officer Murphy testified that after he left the vice unit, he continued to talk with detectives there regarding Pierre, and no one ever informed him that Pierre's license status had changed.

Pierre relies on *United States v. Laughrin,* 438 F.3d 1245 (10th Cir.2006), a Tenth Circuit case, to argue that Officer Murphy's information (from the time he served in the vice unit) was so old as to be meaningless, and therefore could not justify a traffic stop. *Laughrin,* however, is distinguishable. In that case, a police officer had stopped the defendant based on his knowledge, which was at least twenty-two weeks old, of the defendant's driving record. *Id.* at 1246–47. The officer previously had stopped the defendant when he was driving on a suspended license, but the court noted that there was no indication from the officer's testimony about the length of the license suspension. *Id.* at 1248. The court stated that if there had been testimony about the length of the suspension, the court might have been able to affirm the finding of reasonable suspicion. *Id.* In the absence of such testimony, however, it held that the officer's information was too stale to justify the stop. *Id.*

Here, however, Officer Murphy offered testimony indicating that Pierre's license had been suspended during the entire year that Officer Murphy had served in the vice unit. This testimony suggests that Pierre's license was suspended on an ongoing basis, rather than for a short period of time, making the suspicion that it was still inactive some five months later more reasonable. Moreover, Officer Murphy testified that he kept in touch with some of the detectives in the vice unit, and that none of those detectives ever informed him during conversations about Pierre of any change in Pierre's license status. Although he did not explicitly state as much, the import of Officer Murphy's testimony was that because Pierre's license status was relevant to future investigations and cases, he would have expected someone to have informed him if Pierre's license status had changed. We hold that Officer Murphy had reasonable suspicion to stop Pierre's car, and that the district court did not err in failing to suppress the cocaine seized incident to Pierre's arrest.

Similarly, in *United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004), the Court

upheld the denial of a motion to suppress:

When a police officer conducts a brief investigatory stop of a person in a vehicle,

13

"the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." Id. (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). When Officer Grubb observed Sandridge driving on March 27, 2002, he reasonably suspected that he was driving without a valid license because, just three weeks earlier, on March 5, 2002, Grubb ran a license check on Sandridge's car and learned that he did not have a valid license. With respect to Sandridge's argument that Officer Grubb was not a credible witness because he first testified that the computer check was run a few days prior to the stop, we agree with the district court that the belatedly-discovered records of the March 5 check bolstered Officer Grubb's credibility, since Grubb testified all along that he ran a license check at some point prior to March 27, and, at the second suppression hearing, he specifically stated that the check might have occurred a few weeks before the stop, rather than a few days before. The documentary evidence, however, confirms that Grubb ran the check on March 5, 2002.

Sandridge also argues that, even assuming that Grubb was credible, any reasonable suspicion stemming from the March 5 license check was "stale" by the next time Officer Grubb saw Sandridge driving again, on March 27, 2002. We reject that argument. In situations where the criminal activity is of an ongoing nature, it will take longer for the information to become stale. *See United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001) ("Evidence of ongoing criminal activity will generally defeat a claim of staleness."). Driving without a valid license is a continuing offense—in contrast, say, to a speeding or parking violation—and there are no facts in the record suggesting that Officer Grubb should have assumed that Sandridge's ongoing offense had ceased between March 5 and March 27, 2002. Accordingly, Officer Grubb had a reasonable basis for suspecting that Sandridge still lacked a valid license on March 27 and, therefore, Grubb was permitted to stop Sandridge briefly to determine whether the crime was still being committed. *See United States v. Mans*, 999 F.2d 966, 968 (6th Cir.1993) (holding that an officer's stop of a defendant was reasonable, and not pretextual, where the officer recognized the defendant from prior arrests and knew that his driver's license had been revoked).

Recently, in *Sanchez v. United States*, No. 21-1002, -- Fed. Appx. --, 2021 WL 2822171, at *1–2 (3d Cir. July 7, 2021), the United States Court of Appeals for the Third Circuit, in a non-precedential opinion, upheld the denial of a motion to suppress in similar circumstances to those found in the case at bar.   The case is instructive.

While on vehicular patrol, Detective Gaetan Robert MacNamara recognized Christopher Sanchez behind the wheel of an SUV. MacNamara and Sanchez had history, eight years of encounters. As a result, MacNamara regularly searched Sanchez's name in the Delaware Criminal Justice Information System (DELJIS)

database, learning that Sanchez had a criminal record, but not a Delaware driver's license. And, two months earlier, a confidential informant told MacNamara that Sanchez had a black handgun and drove a grey Mitsubishi SUV.

Spying Sanchez in a vehicle matching the tip, MacNamara decided to stop him on suspicion of driving without a license. After requesting assistance, MacNamara and his colleagues pulled him over. Sanchez appeared to comply, stopping his vehicle as MacNamara pulled up behind. But Sanchez then accelerated forward before a second patrol car boxed him in. Quickly, MacNamara approached the driver's side and opened the door.

The stories briefly diverge: MacNamara testified that he immediately viewed a firearm on the driver's side floorboard. Sanchez says MacNamara yanked him out of the SUV, searched and handcuffed him, and then, using a flashlight, saw the gun on the driver's side floorboard. But both agree a gun sat on the floorboard.

* * *

Traffic stops require reasonable suspicion that a criminal violation has occurred. *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006). Reasonably suspecting a driver lacks a license is enough, *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), and officers may reach that suspicion by relying "on probabilities" combined with "database information and commonsense judgments[.]" *Kansas v. Glover*, —— U.S. ——, 140 S. Ct. 1183, 1190, 206 L.Ed.2d 412 (2020).

That is what MacNamara did here. MacNamara's search of the DELJIS database showed Sanchez lacked a license (a result matching years of searches producing the same result). See, e.g., *United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004) (reasonable suspicion supported traffic stop for unlicensed driving based on 22-day-old database search). As the District Court correctly concluded, that satisfied the "minimal level of objective justification" for the traffic stop. (App. at 17, quoting *Delfin-Colina*, 464 F.3d at 396).

Taking a different route, Sanchez also argues that MacNamara lacked reasonable suspicion because DELJIS does not show licensure from every state. But reasonable suspicion does not require "'rul[ing] out the possibility of innocent conduct.'" *United States v. Henley*, 941 F.3d 646, 653 (3d Cir. 2019) (quoting *United States v. Arvizu*, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). Sanchez also argues that MacNamara should have confirmed Sanchez lacked a license before opening the driver's side door. Not so, because the interactions during the stop are irrelevant to whether the stop was "justified at its inception." *Glover*, 140 S. Ct. at 1191 (quoting *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.,* 542 U.S. 177, 185, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004)). And as explained below, Sanchez's conduct justified MacNamara's safety concerns.

In *Sanchez*, MacNamara had run the defendants name through the database on December

20, 2018; the date of the traffic stop was January 4, 2019.  2020 WL 2404783, *1 (D. Del. May 12, 2020).

Based on this case law, it is clear there is no "bright line rule" as to when Detective Anderson's knowledge of Mr. Cain's prior license suspension status would be considered so old as to not justify a traffic stop. In *Laughrin,* twenty-two weeks was considered too stale; in *Sandridge*, twenty-two days was considered not stale.  In *Sanchez*, three weeks was not considered stale. First, reasonable suspicion must always be evaluated under the totality of the circumstances. *Cortez*, 449 U.S. at 417, 101 S.Ct. 690. Accordingly, courts have consistently refused to adopt per se rules declaring a particular factor sufficient or insufficient to establish reasonable suspicion. *United States v. Green*, 897 F.3d 173, 183 (3d Cir. 2018), citing *Illinois v. Wardlow*, 528 U.S. 119, 126–27, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (Stevens, J., dissenting) (agreeing with the Court's rejection of a per se rule regarding flight from police).

Based on the facts and circumstances of this case, we hesitantly[15] find that the stop of Mr. Cain was reasonable, because Detective Anderson recognized the defendant from prior interactions, including traffic stops, knew his driver's license was previously suspended, he knew he had a prior criminal record including that Mr. Cain had "been arrested for firearms and shootings" and had a reasonable basis to suspect that Mr. Cain was violating Pennsylvania law. Though a criminal record, much less an arrest record, is not sufficient to establish reasonable

---

[15] "Hesitantly," because, as was not the case in some of the authorities identified and relied upon above, Detective Anderson: 1) maintained and produced no documentary evidence of his prior interaction with Mr. Cain or his prior NCIC check on Mr. Cain, 2) could not specifically or confidently date his prior interaction with Mr. Cain, 3) did not cite Mr. Cain for his driving without a license during the prior interaction with Mr. Cain, 4) offered no recollection of the cause or nature of the prior licensure suspension, including its likely length or the possibility/probability that Mr. Cain might have had an opportunity to remedy the suspension. Finally and most concerning: 5) Detective Anderson offered no testimony as to why he did not simply run a new NCIC database license check on Mr. Cain, either while he followed him, or immediately after Mr. Cain parked the vehicle, and Detective Anderson's and another police vehicle blocked Mr. Cain's exit.  An action which strikes the court as a far preferable choice, compared to approaching Mr. Cain with firearms drawn.

suspicion, it is a valid factor. *United States v. Mathurin*, 561 F.3d 170, 177 (3d Cir. 2009). As the court in *Sandridge* stated, "[d]riving without a valid license is a continuing offense – in contrast, say, to a speeding or parking violation – and there are no facts in the record suggesting that [the officer] should have assumed [defendant's] ongoing offense had ceased."  385 F.3d at 1036. Detective Anderson made a commonsense judgment, and reached a reasonable suspicion based on probabilities combined with database information sufficient to satisfy the minimal level of objective justification for the traffic stop.  *Delfin-Colina*, 464 F.3d at 396.

### Pat Down, Detention, and/or Arrest

Having concluded that the traffic stop of Mr. Cain was lawful, we next address whether the pat down and detention were lawful.  On the question of whether the officer reasonably believed the suspect was armed, *Terry v. Ohio* and its progeny again provide the constitutional standard. 392 U.S. at 27, 88 S.Ct. 1868. *Terry* held that an officer may conduct a limited search for weapons when "he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id*. To justify the pat down of a suspect during a *Terry* stop, "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id*. at 27, 88 S.Ct. 1868. There is no requirement that the officer "be absolutely certain that the individual is armed." *Id*. Instead, the officer must simply point to "specific and articulable facts" warranting the pat down for weapons. *Id.* at 21, 88 S.Ct. 1868; *see also United States v. Murray*, 821 F.3d 386, 392–94 (3d Cir. 2016); *United States v. Yamba*, 506 F.3d 251, 254–56 (3d Cir. 2007). The officer's reasonable belief that the suspect is armed must arise prior to initiating the pat down. *See Ybarra v. Illinois*, 444 U.S. 85, 92–93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979).

Moreover, an officer executing a traffic stop may exercise reasonable authority over the

car and its passengers.  If initiation of the traffic stop is valid, the officer may "expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation," but only if the officer "develops a reasonable, articulable suspicion of criminal activity." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) (citation omitted).  An officer may perform a frisk if he has reasonable suspicion that the individual is armed or dangerous based on the totality of the circumstances.  *Pennsylvania v. Mimms* 434 U.S. 106, 111-113, 98 S. Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam).

Based on our review of the relevant case law, and the facts herein, we find that the officers would have had a lawful basis to order Mr. Cain from the vehicle, and perhaps, even pat him down, in order to safely investigate their reasonably held suspicion that he did not have a valid driver's license. The purpose is "not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." *United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir.2010) (internal quotations omitted).

Moreover, a police officer who makes a lawful traffic stop may conduct a pat down search of any occupant of the vehicle, even where there is no suspicion of criminal activity, if the officer has a reasonable suspicion that the person subjected to the first is armed and dangerous. *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *Arizona v. Johnson*, 555 U.S. 323. The force and tactics used by an officer during a stop cannot exceed the amount necessary to ensure the safety of the officer and the surrounding public and may not turn the stop into an arrest. *See Bonner*, 363 F.3d at 216–17; *see also Terry*, 392 U.S. at 24, 29, 88 S.Ct. 1868; *Baker v. Monroe Twp*., 50 F.3d 1186, 1193 (3d Cir.1995). Nonetheless, officers may apply enough force during a stop to neutralize the situation of potential danger, depending on the peculiarities of the stop, including whether the stoppee poses an immediate threat of harm. *See Graham v. Connor*,

490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

However, Defendant argues that the circumstances in this case do not permit the kind of detention authorized by *Mimms* and its progeny, and instead, we must view the matter under the more restrictive standard set forth in *Terry* and *Warlow*, (ECF No. 32 at 14.), and conclude the arrest of Mr. Cain was unlawful.  Indeed, what begins as a valid *Terry* stop, however, can sometimes transform into a *de facto* arrest, which must be supported by probable cause. To determine whether a Terry stop has ripened into an arrest, the Court must "assess 'the reasonableness of the intrusion ..., balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect.'" *United States v. Goode*, 309 Fed. Appx. 651, 653 (3d Cir. 2009). This is obviously not a bright-line test. *See Brown v. City of Philadelphia*, CIV. A. 07–0192, 2008 WL 269495, at *7 (E.D. Pa. Jan. 29, 2008) ("The line between a proper *Terry* stop and an improper *de facto arrest* is elusive and not easily drawn."). "The vast majority of courts," however, "have held that police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se." *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir.1995) (citations omitted). "Nor does placing a suspect in handcuffs while securing a location or conducting an investigation automatically transform an otherwise-valid Terry stop into a full-blown arrest." *Johnson*, 592 F.3d at 448 (citing *Baker,* 50 F.3d at 1193; *Torres v. United States*, 200 F.3d 179, 185 (3d Cir.1999)).

Nevertheless, although these actions might not automatically transmute a *Terry* stop into an arrest, there must be some reason for the police to resort to such measures. *See Baker*, 50 F.3d at 1193 (explaining that the "use of guns and handcuffs must be justified by the circumstances ..."); *Johnson*, 592 F.3d at 452–53 (noting that "the use of guns and handcuffs must be justified

by the circumstances that authorize an investigative detention in the first place") (internal citation and quotation marks omitted). In *Johnson*, for example, the Court of Appeals for the Third Circuit held that the police officers were justified in blocking the defendant's vehicle, drawing their weapons, and eventually handcuffing the vehicle's occupants because "the occupants had been involved in a physical altercation and shooting just minutes before," thereby giving the officers reasonable suspicion that the occupants were armed and dangerous. *Johnson,* 592 F.3d at 453. Likewise, in *United States v. Coker*, 223 Fed. Appx. 136, 141 (3d Cir.2007), the Court of Appeals held that the officers acted justifiably in blocking a car, jumping on the hood with guns drawn, handcuffing the defendants, and removing them from the vehicle, inasmuch as the defendants had been involved in a shootout earlier in the day and were reaching toward the floor of the car as the officers approached. Accordingly, the court concluded, the officers' actions "did not turn an investigatory stop into an arrest." *Id.*

Officers had no specific reason to believe that their actions were necessary under the circumstances. Prior to the date in question, Mr. Cain was not a suspected drug dealer. In fact, while Detective Anderson explained he had a history of arrests for firearms violations and shootings, there is scant credible evidence that the officers had reason to think that he was armed and dangerous on May 20, 2020. Moreover, once the officers moved upon the vehicle, Mr. Cain did not make any furtive movements or otherwise suggest that he may have posed a threat to officer safety or the general public. This did not justify the degree of the intrusion imposed by the officers. Indeed, the officers could have avoided this issue altogether by simply approaching Mr. Cain and ordering him from the vehicle.

Accordingly, based on a review of the totality of the circumstances, the Court concludes that Mr. Cain was arrested when he was removed from the rental vehicle at gun point, placed on

the ground, and handcuffed.

**Probable cause to arrest**

Having determined that Mr. Cain was under arrest after the officers approached with guns drawn, Mr. Cain was removed from the vehicle, placed on the ground, and handcuffed, the Court must now decide whether there was probable cause to believe that Mr. Cain was committing or had committed a crime prior to his arrest.

When the validity of an arrest is challenged, it is the task of the district court to resolve "whether the facts available to the officers at the moment of the arrest" amounted to probable cause. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Probable cause is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act*." Maryland v. Pringle,* 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (internal quotation and citation omitted). It exists whenever "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed [by the person to be arrested]." *Dunaway v. New York*, 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (internal citation and quotation marks omitted) (brackets in original). "[T]his standard 'requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt.'" *United States v. Burton*, 288 F.3d 91, 98 (3d Cir. 2002) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482–83 (3d Cir. 1995)).

In sum, the Court concludes that the facts known to the officers were insufficient to lead a reasonable observer to believe that Mr. Cain was committing or had committed a crime at the time he was arrested. We note the arrest occurred prior to the plain view discovery of the marijuana,

the search of the vehicle and prior to the purported "pat down". Even "view[ing] these facts through the lens of the Task Force's significant experience," they were not enough to arrest Mr. Cain. *Id*. at 99 (citation omitted). At most, the facts were such that a brief, investigatory stop— one involving a lesser degree of intrusion than that which actually occurred here—should have been made or additional information gathered to confirm or dispel the officers' suspicion. Accordingly, because Mr. Cain was arrested without probable cause, the arrest was unlawful under the Fourth Amendment.

**Automobile Exception**

Next, we address Mr. Cain's argument that a Fourth Amendment violation occurred as to the search of the vehicle. The government contends that the search and seizure of evidence therein were clearly justified under the automobile exception to the warrant requirement. As stated previously, the officers on site noticed an overwhelming odor of fresh marijuana as they approached the vehicle. Detective Anderson testified at the preliminary hearing that the marijuana was located on the top of the rear passenger seat in plain view and was immediately identifiable as marijuana. (ECF No. 32-1 at 11).

The United States Court of Appeals for the Third Circuit has recognized the "broad sweep of the automobile exception," pursuant to which a vehicle may be searched without a warrant upon a showing of probable cause that evidence of a crime may be located in the vehicle. *United States v. Donahue*, 764 F.3d 293, 300 (3d Cir. 2014). "If probable cause justifies the search ..., it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). The probable cause inquiry "is entirely objective," *Halsey v. Pfeiffer*, 750 F.3d 273, 299 (3d Cir. 2014), and is "commonsense," "practical," and "nontechnical;" it is based on the totality of the circumstances

and is judged by the standard of "reasonable and prudent men." *Illinois v. Gates,* 462 U.S. 213, 230-31, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (internal quotation marks and citations omitted). The Court evaluates "the events which occurred leading up to the ... search, and then ... [decides] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to ... probable cause." *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). If there was a "fair probability that contraband or evidence of a crime" would have been found, there was probable cause for the search. *Gates,* 462 U.S. at 238, 103 S.Ct. 2317.

The odor of fresh marijuana emanating from vehicle alone is enough to establish probable cause. *California v. Acevedo*, 500 U.S. 565, 580 (1991), *U.S. v. Ross* 456 U.S. 798, 804-09 (1982). *U.S. v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006). "The odor of marijuana in a car can be evidence of the most persuasive character" and generally satisfies probable cause to search the entirety of a vehicle under the automobile exception. *United States v. Green*, 897 F.3d 173, 186 (3d Cir. 2018).

Here, the officers, prior to searching the vehicle, were aware of the strong, overwhelming odor of fresh marijuana emanating from the vehicle. Detective Anderson testified that he has training and experience in narcotics, Tr. at 32, and furthermore, the record includes repeated reference to the officers smelling marijuana after the vehicle was stopped and before it was searched. Detective Anderson's testimony that he smelled the odor of marijuana, and that the marijuana was in plain view, was credible, and therefore, the officers possessed sufficient probable cause to search the parked vehicle.[16] The smell of marijuana was articulable and particularized to

---

[16] Warrantless searches of vehicles have been found lawful even "in cases in which the possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not nonexistent." *Cady v. Dombrowski*, 413 U.S. 433, 441–42, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *see also Labron*, 518 U.S. at 939–40, 116 S.Ct. 2485 (automobile

the vehicle which Mr. Cain, its sole occupant, had been driving, and therefore, this established probable cause in this case.[17]

Defendant's motion to suppress the evidence seized from the vehicle is therefore denied on the grounds that the automobile exception applies.

### Exclusionary rule

This leaves the remaining issue, whether the fentanyl and currency found on Mr. Cain can be suppressed, despite our finding that his arrest was unconstitutional.  "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'"  *Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (internal citations omitted). Evidence is not the "'fruit of the poisonous tree,'" however, "simply because it would not have come to light but for the illegal actions of the police." *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Rather, the Supreme Court has held that "the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which [an] objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the

---

exception applied to the warrantless search of defendants' vehicles, even though the defendants had already been arrested at the time of the search and no exigent circumstances existed). This is because, "[e]ven in cases where an automobile [i]s not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception." *California v. Carney*, 471 U.S. 386, 391, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). Thus, officers can generally search readily mobile vehicles without a warrant as long as they have probable cause, even if there is no immediate risk of flight. *Labron*, 518 U.S. at 940, 116 S.Ct. 2485.

[17] The Court pauses to note the recently evolving questions respecting the "plain smell" of marijuana as a basis for either reasonable suspicion or probable cause under Pennsylvania state law in light of recent Pennsylvania medical marijuana law changes. No similar changes have occurred respecting the status of marijuana as a Schedule I drug under prevailing federal law.  Argument regarding these state law changes are not advanced by counsel as material to our analysis, and beyond this brief acknowledgement of them, do not figure in this Court's analysis.

primary taint.'" *Id*. at 488, 83 S.Ct. 407 (internal citation and quotation omitted). To overcome Mr. Cain's suppression motion, therefore, the government would have to establish one of the traditional exceptions to the *Wong Sun* rule: attenuation, inevitable discovery, independent source, or some intervening act or event sufficient to purge the taint of the illegal arrest. *Id*. at 269.

**Inevitable discovery**

The Court holds that the doctrine of inevitable discovery saves the evidence seized during the search following the unlawful arrest/purported "pat down" of Mr. Cain from exclusion. The government argues that even if the officers did not have reasonable suspicion to remove Mr. Cain from his vehicle at gunpoint, place him on the ground, and cuff him for officer safety, they would have alternatively had probable cause to search Mr. Cain following his arrest for the possession of the firearm and marijuana seized from the vehicle. *Nix v. Williams*, 467 U.S. 431, 443-444 (1984). The inevitable discovery doctrine should be applied when the "exclusion of evidence that would inevitably have been discovered would also put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place."

The inevitable discovery doctrine "allows for the admission of evidence that would have been discovered even without the unconstitutional source." *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (citing *Nix v. Williams*, 467 U.S. 431, 443–444 (1984)). Under the inevitable discovery doctrine, "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received." *United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (citation omitted). The Government can meet its burden by establishing "that the police, following routine procedures, would inevitably have uncovered the evidence." *Id.* (citation omitted).

After smelling the odor of marijuana, Mr. Cain was removed from the vehicle, placed on the ground, cuffed, "patted down" for safety, detained, and then searched for contraband after feeling the fentanyl during the pat down. Officers then immediately searched the vehicle and recovered the firearm and marijuana.   However, had the officers searched the vehicle prior to "patting down" Mr. Cain, they would have discovered the firearm (pursuant to the automobile exception) and the marijuana (pursuant to both the automobile exception and plain view), either of which would in turn, have provided probable cause to arrest Mr. Cain.  Detective Anderson explained the routine policy and nature of a search incident to arrest.  Even if the initial arrest of Mr. Cain was unlawful because there was no probable cause, the inevitable discovery doctrine applies. The fentanyl would have been discovered by lawful means pursuant to the search incident to arrest for possession of marijuana and or the illegal firearm, a routine police procedure.

**Cell Phone Search Warrant and Probable Cause**

As previously noted, the basic premise of Fourth Amendment doctrine is that searches should be undertaken with judicial oversight. *Katz*, 389 U.S. at 357, 88 S.Ct. 507. Here, a search warrant was issued by a magistrate on June 26, 2020. The court pays "great deference" to the magistrate's initial determination of probable cause. *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The court's role is limited to ensuring that a magistrate had a "substantial basis" for concluding that the affidavit supporting the warrant established probable cause. *Id.* at 236, 103 S.Ct. 2317.

The government argues that the search warrant provided a substantial basis for finding probable cause to search the cell phones.  *Illinois v. Gates*, 462 U.S. at 238-39 (1983); *United States v. Kepner*, 843 F.2d 755, 762 (3d Cir. 1988). The warrant, signed by a magisterial judge, specified the names of the two phones to be searched.   The detective provided a detailed

26

description of the traffic stop, and included smell of fresh marijuana detected prior to the unlawful arrest, the subsequent recovery of the firearm, marijuana, suspected heroin, cash, and the two phones.  He also explained that the amount of drugs seized was significantly more than a user would carry on their person at one time, and further, that the lack of user paraphernalia found at the scene and Mr. Cain's good health supported a finding that Mr. Cain was displaying no characteristics of a drug user. In addition, Detective Anderson explained that based on his experience drug dealers carry multiple phones, firearms, and large amounts of cash, and that they tend to use their phones in furtherance of conducting their drug dealing business.  Gov't Ex. 5, ECF No. 35-5.

We find that the search warrant supports a finding of probable cause and therefore will deny the motion to suppress the evidence obtained as a result of the cell phone contents.

### Good faith exception

The government further argues that even if the search warrant affidavit was deemed not to provide probable cause, their contents were sufficiently detailed to justify the officers' reliance on the search warrant and thus, the good faith exception to the exclusionary rule would apply.  *United States v. Leon*, 468 U.S. 897, 900, 920-21 (1984). The Supreme Court noted in *Leon* that a situation in which an officer relies on a duly authorized warrant is a "particularly compelling example of good faith." 468 U.S. 897, 920 n.21, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The Supreme Court explained it is the magistrate's responsibility, not the police officer's, to determine whether the allegations establish probable cause and, if so, to issue a warrant. *Id*. at 921, 104 S.Ct. 3405. Ordinarily, an officer cannot be expected to question the magistrate's probable cause determination. *Id.* A warrant is a judicial mandate and the officer has a sworn duty to carry out its provisions. *Id.*

Accordingly, based on our review of the contents of the warrant and the applicable case law, we find the good faith exception to the exclusionary rule would apply and will deny the motion to suppress the contents of the cell phone on that alternative basis.

**IV. <u>CONCLUSION</u>**

Based on the forgoing, Mr. Cain's Motion to Suppress (ECF No. 31) is denied. An appropriate Order will follow.

Dated: August 12, 2021

*s/Robert J. Colville*
Robert J. Colville
United States District Judge

cc/ecf:  All counsel of record

28